IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| IN RE: | : | CHAPTER ELEVEN |
| --- | --- | --- |
| | : | |
| WIRELESS TELECOMMUNICATIONS | : | BANKRUPTCY NO.: 5-02-bk-03994 |
| INC., et al., | : | {**Nature of Proceeding**: Thirteenth and |
| | : | Final Application of Pepper Hamilton LLP |
| | : | for Final Compensation and Reimbursement |
| DEBTOR | : | of Expenses (Doc. #1353)} |

# **OPINION**

The bankruptcy case of Wireless Telecommunication, Inc. ("WTI") had more peaks and valleys than our great Appalachian mountain range. The case started in 2000 as an involuntary filing in the District's Harrisburg division, docketed to Case No. 1-00-02188 with our then Chief Judge, Robert J. Woodside, presiding.[1] It was followed by the voluntary Chapter 11 filing of a related entity known as Wireless Ventures, III, Inc. ("WVI") (Case No. 1-00-bk-03533), which later in 2000 converted to Chapter 7. WTI remained in Chapter 7 for three years while the Trustee appointed by the United States Trustee attempted to effect a liquidation of its sole assets, telecommunication licenses. The effort was unsuccessful, but rather than suffer dismissal, it converted to Chapter 11 in 2003. (Doc. #118.) A private sale was actually arranged for $4.5 million, (Doc. #450 Ex. 5), a figure sufficient only to partly address secured creditors. Subsequently, however, the stock of Wireless was transferred, and under new management, the Debtor was able to arrange a sale in an amount in excess of $12 million, a figure initially thought to be sufficient to pay in full all estate creditors. It was a hollow promise, however. Years of delay in the approval of the license transfer by the FCC and significant litigation over the fees of

---

[1] I succeeded to Judge Woodside's administration upon his passing in 2002.

professionals and management have reduced the pot to insolvency, apparently insufficient to address even the pool of administrative creditors.[2]

Now pending before the Court are the Final Fee Applications for general counsel, Pepper Hamilton, LLP, ("Pepper")(Doc. #1353); Robert J. Keller, Special FCC counsel (Doc. #1352); and of Executive Sounding Board Associates, Inc. ("ESB"), the business manager (Doc. #1355). Pepper is seeking an award of $2,164,000. (Transcript of June 10, 2010 at 8.) Objections were filed by the United States Trustee and Vermont Telephone, Inc. ("Vtel")[3]. A number of objections were specifically raised by Vtel. Disposition of those objections will also dispose of the objections of the United States Trustee. I will address them *seriatim*. Testimony on the objections took place over three days. While the first two days of testimony dealt with interim applications, it was agreed that testimony and exhibits would be incorporated as a part of the hearing on Pepper's final application.

The Court has an independent responsibility to review fee applications. *In re Busy Beaver Building Centers, Inc.*, 19 F.3d 833, 841 (3d Cir.1994). Compensation depends on the review by the Bankruptcy Court for a determination of how that service benefitted the estate. *In re Engel*, 124 F.3d 567, 571 (3d Cir.1997). More specifically, 11 U.S.C. § 330(a)(4(A) "seeks to assure that only services that are unique, necessary or reasonably likely to benefit the debtor's estate are compensated." *In re Top Grade Sausage, Inc.*, 227 F.3d 123 (3d Cir.2000). In this

---

[2] A number of administrative creditors did tentatively agree to a reduction of their claim in order to provide a 5% distribution to unsecured creditors, but that was contingent on a timely disbursement, a factor I no longer believe is applicable.

[3] Vermont Telephone, Inc. has oftentimes referred to itself as "Vtel". (See Document #1222.) Vermont Wireless, Inc., apparently a bidder for the Debtor's wireless licenses, also refers to itself as "Vtel." (See Doc. #676.) They seem to be related entities represented by the same counsel. I will simply refer to both entities as Vtel and be more specific should the distinction become material.

process, the Court is directed to undergo "careful scrutiny." See Legislative History – P.L. 95-598 (Report of the Committee on the Judiciary, United States Senate, to accompany S.2266, S. Rep. No. 95-989, 95th Cong., 2d Sess. (1979)) as found in Volume D Collier on Bankruptcy App.Pt. 4(e)(i)(Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.). The burden of showing necessity of services and benefit to the estate is on counsel. *Engel*, 124 F.3d at 573. In determining the amount of reasonable compensation to be awarded, the Court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including-

>   (A) the time spent on such services;
>   (B) the rates charged for such services;
>   (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>   (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and
>   (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>   (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.
>
>   (4)(A) Except as provided in subparagraph (B), the court shall not allow compensation for-
>       (i) unnecessary duplication of services; or
>       (ii) services that were not-
>           (I) reasonably likely to benefit the debtor's estate; or
>           (II) necessary to the administration of the case.

11 U.S.C. § 330(a)(3), (4)(A).

With this general guidance in mind, I will examine some of the factors that have been put in issue.

*Benefit to the Estate*

Section 330(a)(4) requires that professional services be "reasonably likely to benefit the estate" or be necessary to its administration. 11 U.S.C. § 330(a)(4). Throughout the course of the hearings, Vtel maintained that efforts of Pepper failed to produce a tangible result, therefore demonstrating no benefit to the estate. (Doc. #1222 at 12.) The absence of economic benefit to the estate was not seriously challenged. Nevertheless, the pivotal argument of the Pepper firm was that benefit to the estate is not necessarily measured by the dollar return on the effort.

The Objector has misunderstood the concept of benefit. It is the prospective likelihood of benefit to the estate that is critical, not the actual results. *In re Smith*, 317 F.3d 918, 926 (9th Cir.2002), *cert. denied*, 538 U.S. 1032, 123 S. Ct. 2074, 155 L. Ed. 2d 1060 (2003) ("[S]ervices that are reasonably likely to provide an identifiable, tangible and material benefit to the debtor's estate can be compensated, even if they do not actually provide such a benefit . . . ."). Colliers has observed that "[t]he majority of courts have determined the 'necessity' of particular services from the perspective of the time that the services were rendered, rather than based on hindsight after the services had been performed. This is the approach now codified in section 330(a)(3)(C)." 3 Collier on Bankruptcy ¶ 330.03[1][b][iii] at 330-25 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). This change to the statute, made by the Bankruptcy Reform Act of 1994, indicates that benefit to the estate is to be determined *at the time at which the service was rendered*. Having said that, I will address the specific categories of concerns raised by the Objector, beginning with what was called an inordinate amount of professional time spent resolving the Proof of Claim of Lancaster Broadcast Partners Revised. (Proof of Claim #18.)

*The LBPR Settlement*

By Claim dated November 9, 2000, Lancaster Broadcasting Partners Revised filed a Proof in the amount of $4.2 to 9 million. That Claim was proposed to be settled for $60,000. (Doc. #660.) Objections to that settlement resulted in significant investment of additional time spent by Debtor's professional, resulting in the withdrawal of the settlement. While the time spent reviewing the settlement could not translate into an economic benefit to creditors, it appears to fall squarely into that provision allowing compensation to be paid for services necessary to the administration of the estate under § 330(a)(3)(c) and (4)(A)(ii)(II). Settlements in our Circuit are not pro forma proposals approved by the Court in the absence of objection. The lesson of *In re Martin,* 91 F.3d 389 (3d Cir.1996) is that a bankruptcy judge must scrutinize settlements, even in the absence of objections. *Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159, 165 (3d Cir.2002); *In re Martin*, 91 F.3d at 393. I would be hard pressed to suggest that review of proofs of claim and preparation for any settlement hearing did not come under that umbrella of being necessary for estate administration, especially where, at the time, it appeared likely that a 100% distribution to creditors would take place. Of course, challenges over nominal claims would be effort poorly spent, but that is not the nature of these underlying facts.

*The Motion to Suspend Consideration of the Vtel Settlement*

The Objector, Vtel, challenges the propriety of reconsidering the wisdom of pursuing the so-called Vtel settlement based on information received from the Debtor's principal, Thomas Balun. Of course, some subjectivity might be implicated in Vtel's objections based on the fact that it was a party to the settlement being questioned. Vtel suggests that the reconsideration was

all for naught since a new settlement was on virtually the same terms.

Again, the Objector misapplies the law under § 330(a)(3)(c). Benefit to the estate is measured at the time of the action, not by the result. The very admission by the Objector that Pepper's work may have been done "in good faith," (Doc. #1222 at 14), is an indicator that here Pepper's motivation was not in question.

Moreover, Pepper's investigation was preceded by a request to the Court to approve an investigation. (Doc. #950.) Such request was granted after hearing. If that disposition was imprudent, an appeal could have been lodged, but no such appeal was forthcoming. The activity of Pepper was Court authorized and likely based on reasonable cause. I find that it was beneficial to the estate and of necessity in order to support the then pending motion to approve settlement.

*The ITFS Leases*

The Objector alleges some sort of malpractice in accusing Pepper & Keller of failing to defend ostensible property of the estate known as the oral ITFS leases (of wireless licenses) when sold to an entity known as Utopian. While the word "malpractice" was never actually verbalized, the allegations of the Objector can have no other significance. It is fair to say that such allegations are fair consideration at this time since it is inextricably intertwined with the reasonableness of counsel's conduct. Malpractice is a defense to a fee application. *Billing v. Ravin, Greenberg & Zackin, P.A.*, 22 F.3d 1242, 1253 (3d Cir.1994). The substance of the Objector's argument is that Pepper, knowing that the ITFS leases were valuable, allowed claims to their ownership to possibly revert to the principal, Balun, to the detriment of the estate. Thereafter, when the ITFS leases were proposed to be conveyed to Vtel, Balun's information

was the catalyst for undergoing an intense evaluation of the market value of these items. This topic is inextricably intertwined with the delay of the Vtel settlement heretofore discussed.

Pepper's response was that the licenses would have reverted to Balun under an early plan that was not specifically scrutinized because, at the time, a 100% distribution was likely. As that prospect diminished and the valuation of the licenses were questioned, the licenses then became part of the Vtel settlement, only to be thereafter challenged by Debtor's principal. While the Debtor, and presumably the Debtor's principal, accepted the terms of the original Vtel settlement, the lessons of *In re Martin*[4], are such that a party in interest is free to question the wisdom of an earlier decision.

*Purported Balun Representation*

The primary thrust of the objections was directed to the rather significant portion of the fee application devoted to obtain an award of fees, wages, and a bonus, or otherwise to defend disgorgement demands on behalf of Wireless' principal stockholder and officer, Thomas Balun. A survey of the multiple interim applications filed by Pepper shows the efforts to collect on behalf of Balun were broken down into the following matters:

1. A *nunc pro tunc* fee application for Balun filed on April 27, 2007 to Doc. #589;

2. A motion for approval of sale and compensation for president filed June 12, 2007 to Doc. #676;

3. A fee application for Balun filed June 26, 2007 to Doc. #703;

4. The disgorgement defense on behalf of Balun generated by Motion filed

---

[4] In *In re Martin*, 91 F.3d 389, 393 (3d Cir.1996), the court set forth the duty of a trustee to bring changed circumstances to the attention of the trial court even if those factors may result in an agreed settlement being disapproved.

December 12, 2007 at Doc. #892; and

     5.    Balun's second fee application filed March 12, 2009 to Doc. #1139.

    *1. Purported Balun Representation: Nunc pro tunc Fee Application, Doc. #589*

The application is telling, since it appears to request alternative relief depending on the findings of the Court. Apparently, as President of the Debtor and in lieu of salary, Balun authorized a stream of funding from the Debtor to a Balun-owned corporation called Broadband Services, Inc. Little or no explanation was proffered for this diversion of funds from the Debtor. No suggestion was made that this was an "ordinary course" expense for the Debtor. It was simply implied that the President deserved a salary, that he had not paid himself a salary, and that he alternatively paid over funds to Broadband in the approximate amount of $30,000. (Doc. #589 at ¶5.) The prayer of the pleading asked that Balun be authorized to receive a $20,000 monthly compensation from September of 2006.

Generally speaking, payments in the ordinary course of business need not be pre-authorized by the court. 4 Collier on Bankruptcy ¶ 503.03[4] at 503-17 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).[5] These payments would include employee wages. It is understandable that an "employee" in this case may want some sort of order ratifying a "wage" if payments were somehow rerouted through a corporate entity, such as Broadband, Inc. The responsibilities to file such an application appear to be within the purview of the retention of Debtor's counsel. The line may have been crossed, however, when a sale application was filed

---

[5] "Although courts deal gingerly with the payment of professionals, 'ordinary course of business' administrative expenses (such as current postpetition wages and trade debt) generally are paid when due. . . . Additionally, section 363(c) allows a trustee to use property of the estate in the ordinary course of business without providing for notice or an opportunity for a hearing."

[K:\Cathy\Opinions-Orders filed 2011\5-02-bk-03994_Wireless_#1353.pdf]    8

Case 5:02-bk-03994-JJT   Doc 1432   Filed 04/18/11   Entered 04/18/11 11:52:38   Desc
Main Document   Page 8 of 15

on June 12, 2007.

*2. and 3. Purported Balun Representation: Balun Application of June 12, 2007, Doc. #676, and Balun Application of June 26, 2007, Doc. #703*

While that application sought approval of the terms of a sale of FCC licenses owned by the Debtor, it, curiously, further requested authorization for the buyer to pay the corporate President, Balun, the sum of $300,000, in what appeared to be a blatant attempt to influence the Debtor's acceptance of the bid. Frankly, the benefit to creditors of advancing these terms was difficult to fathom. This was a point finally appreciated by the Debtor when the application was withdrawn on June 26, 2007, and replaced by a request for a sales commission for Balun, a sort of bonus. That request was eventually denied without prejudice after hearing on October 27, 2008.

*4. Purported Balun Representation: Disgorgement Request, Doc. #892*

Thereafter, on December 12, 2007, a creditor of Wireless, Vermont Telephone, Inc. (Vtel), filed a disgorgement request against Wireless principal, Balun, for those sums transferred to his company, Broadband Services, Inc. Eventually, that effort was successful and disgorgement, in the form of an offset, was entered against Balun on October 27, 2008. (Doc. #1090 at ¶7.)

*5. Purported Balun Representation: Balun's Second Application for Compensation, Doc. #1139*

A renewed application was filed on behalf of Balun in March 12, 2009. After a hearing, an Order was entered approving Balun's employee compensation, awarding Balun a bonus. (Doc. #1197.)

The operative question in evaluating the reasonableness of Pepper's fees is what part of this advanced the interests of the Debtor and its creditors. As earlier indicated, it is the Court's

[K:\Cathy\Opinions-Orders filed 2011\5-02-bk-03994_Wireless_#1353.pdf]    9

Case 5:02-bk-03994-JJT    Doc 1432    Filed 04/18/11    Entered 04/18/11 11:52:38    Desc
Main Document    Page 9 of 15

opinion that the effort to seek authorization to pay Debtor's employees is an inherent benefit to the estate. Having said that, defending that employee from disgorgement demands put counsel in a clear conflict that was certainly recognized by either Pepper or Balun since the law firm of Blank Rome LLP immediately entered their appearance on behalf of Balun. (Doc. #788 filed 8/3/07.) In a similar vein, Balun's attempt to secure a bonus for his "good work" could hardly benefit the creditors of the estate but, specifically, would only be of value to Balun himself. While Balun was successful in that attempt, the Pepper firm deserves no compensation for time advancing the interests of Debtor's principal.

There are two additional areas of significant concern to the Court with regard to benefit of the estate. They are: Pepper's efforts to ratify the Broadband, Inc. payments; and Pepper's effort to enrich Balun as a byproduct of the contemplated sale proposed by Doc. #676.

Based on the lack of benefit to the estate demonstrated by Pepper, I will disallow fees for these endeavors.

*Alleged Miscellaneous Abuses*

There was a time when the courts would measure the worth of a professional's services by the amount distributed to creditors, actually reducing fees in order to achieve economies that would allow a distribution. That time has passed as noted in *In re Busy Beaver Building Centers, Inc.*, 19 F.3d 833, 851. (CA3 1994)[6]. Congressional policy now favors full compensation to debtor's attorney over a larger distribution to its creditors. This is not to say that shameless double-billing and duplicative services should be authorized. In that regard Vtel

---

[6] Citing to the Congressional Record. ("Notions of economy of the estate in fixing fees are outdated and have no place in a bankruptcy code.") 124 Cong.Rec. 33, 994 (1978).

has referenced multiple occasions when Pepper's application notes that lawyers and paralegals from the same firm would meet with each other, billing their standard rate simultaneously. Vtel references what appears to be some District policy that disallows such procedure. (Transcript of July 30, 2009 at 112.) No citation is provided for that position. Obviously, there should be some demonstration that multiple participation is necessary for the business of case administration. Nevertheless, I compare the process to an orchestra conductor convening his musical group in presentation of a symphony. The absence of any one instrumentalist could well defeat the quality of the entire presentation. The burden, of course, is on the applicant to demonstrate the necessity of such. If the applicant wishes to recover for the time utilized by various professionals convening for the advancement of some issue, specific explanation is the minimum that should be required. In the absence of a reasonable explanation, I would presume that concurrent billing hours to attend the same gathering would be duplicitous.

Vtel also challenges Peppers' application for billing for paralegals and clerical staff. Since *Busy Beaver* has embraced the possibility of billing out clerks and paraprofessionals, this has been acceptable in the Circuit. *In re Busy Beaver Building Centers, Inc*., 19 F.3d at 848.

An issue was raised of an attempt by Pepper to charge the estate with the time preparing a fee application for another law firm, to wit, Keller. (See Transcript of June 10, 2010 at 84; Doc. #1393.) The record fails to demonstrate how the performance of work by one professional for another professional should be chargeable to the estate. That activity is certainly beyond the scope of the appointment.

An area of specific controversy has been the time utilized in preparing the rather detailed fee application, as well as the long hours preparing and advancing the defense of the fee

application. This, too, was a topic addressed by the *Busy Beaver* Opinion in footnote 17 of that case. *In re Busy Beaver Building Centers, Inc*., 19 F.3d at 847. While illuminating in its emphasis on the market approach to reimbursement, no clear conclusion was offered. By reason of a 1994 Amendment to the Bankruptcy Code, statutorily we now have the benefit of 11 U.S.C. § 330(a)(6), which articulates that preparation of a fee application is compensable. It did not address the compensability of defending the application. The courts remain split on that issue. Compare *In re Worldwide Direct, Inc*., 334 B.R. 108, 112 (D.C.Del. 2005) (allowing fees), with *Boyd v. Engman,* 404 B.R. 467, 482 (W.D.Mich. 2009) and *St. Rita's Associates*, 260 B.R. 650, 652 (Bkrtcy.E.D.N.Y. 2001)(denying fees). In comments before Congress, made on behalf of the American Bankruptcy Institute, the ABI took the position that "[r]easonable time spent preparing and prosecuting fee applications should be expressly compensable." This was obviously a position partially rejected by Congress which provided for compensation for the preparation of the application, but not the prosecution for such. *Statement of the American Bankruptcy Institute for an Oversight Hearing on Professional Fees in Bankruptcy Cases Before the Subcommittee on Courts and Administrative Practice Senate Committee on the Judiciary,* as found in Arnold & Porter LLP Legislative History: P.L. 103-394 (March 24, 1992).

In *St. Rita's Associates*, the bankruptcy judge followed a model familiar with premises utilized in *Busy Beaver* by looking to the market and concluding that attorneys generally do not receive compensation for litigating the collection of their fees. This conclusion is consistent with the terms of 11 U.S.C. § 330(a)(3)(F), which identifies as a factor, the customary compensation of practitioners in non-bankruptcy cases.

Further analysis suggests that it is customary for counsel to collect its fees and expenses

for pursuing collection in a statutory fee-shifting case such as civil rights, environmental protection, and antitrust cases. This is because it is only appropriate that a wrong doer should pay the attorney for efforts that are designed to enforce a legislative statutory substantive right. Contrast this with the common-fund case where the attorney's efforts have created a fund to be shared by his "clients." See discussion in *In re Blue Coal Corporation*, 206 B.R. 721, 723 (Bankr.M.D.Pa.1997). See, also, *Pawlak v. Greenawalt*, 713 F.2d 972, 977 (3d Cir.1983), where in common-fund cases, such a reimbursement would necessarily benefit counsel at the expense of the beneficiaries and, normally, not be allowed. *Lindy Bros. Builders, Inc. v. American Standard Radiator & Standard Sanitary Corp., (Lindy II)*, 540 F.2d 102, 111 (3d Cir.1976) (en banc). The question becomes whether bankruptcy cases are akin to fee-shifting cases or common-fund cases. Even though the following quote dealt with a bonus request, I conclude that it has equal application when considering the legitimacy of a request that the estate bear the expense of fee litigation.

> While bankruptcy cases have been viewed as having some similarity with fee-shifting cases, our circuit has recognized features common to the standards applicable in bankruptcy cases and common fund cases, and has discounted such a parallel with fee-shifting cases. *In re Busy Beaver Bldg. Ctrs.*, 19 F.3d 833, 841-842 (3d Cir.1994). *In accord, In re Farah*, 141 B.R. 920, 927 (Bankr.W.D.Tex.1992). Nevertheless, this court is of the opinion that enhancements for bankruptcy representation is likely to require considerations of factors utilized in both common fund and fee-shifting cases. This is so because bankruptcy is not a one-dimensional contest between litigants. Rather, it carries all the variables and complexities that might be present in counseling any economic unit. This is true whether the bankrupt be business or individual, operating or liquidating. A lawyer may be called upon to advise a trustee, or debtor, regarding duties to the estate, while pursuing the whereabouts of assets, investigating bankruptcy crimes, or preparing estate accounts. This may all occur simultaneously with various preference and fraudulent conveyance litigation. In short, different considerations must influence individual facets of the representation. *Footnote omitted.*

*In re Blue Coal Corp.*, 206 B.R. 721, 727 (Bkrtcy.M.D.Pa.,1997).

The parties can gather that I am troubled by awarding the Pepper firm attorney fees for defending their fee application to the detriment of the unsecured creditors. In fact, there are many reasons favoring and disfavoring the allowance of fees for litigating attorney's compensation. Gilmore F. Diekmann, Jr., *Principles Applicable to Recovery of a Fee Award for Time Spent Preparing and Litigating an Attorneys' Fee Application*, 324 PLI/Lit 243 (1987). While I have no desire to implement a *per se* rule of disallowance, I can articulate no benefit to the estate or necessity as it relates to the unsecured creditors of Wireless. Without such ability to set forth a rationale for imposing the expenses of this effort on the creditor body, I am compelled to decline to approve same.

The billing of research hours has been raised by the Objector. I estimate that in excess of $12,000 has been charged to the estate by reason of computer assisted legal research (CALR). This is separate and apart from the professionals time doing that research. While the estate may very well be liable for the actual expense of the use of CALR, there is nothing on this record that explains in what manner the expense was calculated or suggests that other clients of the firm are billed in like manner. The request cannot be approved on this record.

I have not attempted to detail, line by line, the objectionable parts of the application. As stated in *Busy Beaver*, it is not the bankruptcy court's function to review every picayune element of the application. *In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 845 and n.12 (3d Cir.1994).

In summary, while I haven't analyzed every itemization of the objectionable elements, I have concluded that it is in the $200,000-$300,000 range. Ironically, Pepper has, heretofore, offered to surrender 12.38% of their fee application to voluntarily provide for a nominal distribution to creditors. That calculates to a $267,903.20 reduction in the request. While other

administrative creditors are clearly not bound to follow this reduction, it appears abundantly clear that it should be imposed on Pepper for the reasons outlined in this Opinion.

Objections filed to the fee applications of Robert J. Keller and Executive Sounding Board Associates, Inc., have been reviewed and are not of such material significance as to reduce their award.

Separate Orders regarding the applications will follow.

By the Court,

_____
John J. Thomas, Bankruptcy Judge
(CMS)

Date: April 18, 2011